Good morning, Your Honors. Jeffrey Dore on behalf of the appellant. In this case, the district court's bare grant of summary judgment and the award of trinity should be reversed. As briefed and I will briefly address, numerous policies of this court were not followed by the district court. And the result is a very harsh, severe, drastic result, one which is not supported by the record. Let me just ask you about a couple of concessions first. Do you concede that the district court properly dismissed Mr. Ahanchian's Lantham Act claims? There was, as well addressed, the answer is yes. It was not opposed to summary judgment. Do you concede that Mr. Ahanchian is not the sole author of the sex and the pen skit and the space trekker skit and therefore may not maintain copyright claims as to those skits? The answer is, Your Honor, yes. And the implied contract claim, are you still raising that one? Yes, Your Honor, and it's very strong. This is a circumstance where it's clearly undisputed based on the record that this is a he said, she said type of circumstance. There's a clear dispute over what role Mr. Ahanchian had other than he had a writing role of some type. That's clearly not a dispute. Tell me about this movie. I'm wondering if the movie was, say, a unified whole or whether, I haven't seen this movie, whether it was discrete skits that were presented in the course of this movie so that it would be, in essence, a collective work under the Copyright Act. Very important point. First, the movie is a collection of completely independent skits, each skit being a parody of something to do with TV. Each skit doesn't connect with other skits. And in fact, it's very clear from the complaint and it's very clear from the record before you that that is the case. And in fact, that's very critical, because in this case, the complaint alleges 12 specific independent skits which were copyrighted by Mr. Ahanchian. And as to those skits, only two of them were even addressed by name in the motion for summary judgment, which goes to the issue, of course, of whether or not, putting aside whether the court properly didn't consider the opposition, whether the moving papers alone for copyright claims would have been sufficient. Furthermore, that's also shown by the moving papers own evidence. As this court can see from the briefs, it's very clear in the summary judgment papers, the moving papers, that, and this is even cited with some amplification by the sequestered appellees in their own brief, that their view, the defendant appellee's view, of what was a collaborative work had to do with Mr. Ahanchian claiming that he wrote certain skits to be included with the complete screenplay. Mr. Ahanchian's complaint never claims that he wrote a screenplay. Mr. Ahanchian's complaint is focused on specific skits, which he alleges appear verbatim at times in it. I think we recognize that they talk about the movie and you talk about the skits. And the skits are individually copyrightable. I think we understand that they're talking about it that way to confuse us, but we're not confused on that point. So the real question is whether these works were works of joint authorship or not. And whether there's disputed material issues, disputed facts that would warrant a trial. I also think it's really clear that Judge Walters didn't follow our Ninth Circuit law in considering the Rule 60 motion. And then it looks like he didn't consider your position. So you're arguing basically that he should have granted the Rule 60 under our standards and then consider your evidence that it puts in dispute how these skits were written. Whether they're written together or not. Essentially, yes, Your Honor. And if you look at the moving papers, they recognize that these skits were independent and that Mr. Ahanchian has always claimed and testified in this case that he wrote certain skits that were then added to other skits that were pre-existing. And the point of why that's significant is that shows by the moving papers alone, putting aside the opposition, which amplifies each of the skits that are at issue, that there couldn't be a basis for granting copyright summary judgment in this case. Because there was a clear factual dispute over who authored and whether Mr. Ahanchian solely authored certain skits. And that is what the complaint focuses. That's further, and also- When did he first learn that the skits were included in the movie? And that goes to the implied contract claim, Your Honor. So very good question. And the answer is, it's clear from all the testimony and all the evidence that the only evidence of Mr. Ahanchian learning what was included in the movie was when he saw it. And it's also very clear from the moving papers evidence and the opposition, it was considered, that Mr. Ahanchian first saw the movie at a specific time, which was little less than one year before the filing of the complaint, well within a two-year statute of limitation. And if you look at the moving papers, there is no affirmative evidence of any kind as to when Mr. Ahanchian would have ever learned what was in the movie when it was released, other than when he saw it. So you're saying he couldn't be tagged with should have known. Because there were some conversations, when are you going to pay me, or this, that, or the other, right? Clearly, there's no dispute that Mr. Ahanchian was aware that they were finally making a movie. What was actually in the movie, there's no evidence that he knew or would have known until it was released. And in fact, as we all know, when you make a movie, not in this case, by the way, I don't want to suggest there's any evidence that Mr. Ahanchian was ever told that a single one of his claimed skits that he authored was in the movie. That's missing. But even if it were, we all know that you could film parts of a movie, and that the actual movie that's released to the public and released on DVD doesn't contain those. So the only way that you would ever have any actual accrual of an implied contract cause of action would be affirmative evidence of when Mr. Ahanchian knew when his skits were in the movie. And that clearly would have only been when he first saw the movie. And in fact, the evidence shows that Mr. Ahanchian did not even know that the movie was actually released. Because just because you're making a movie doesn't mean it's ever completed. Doesn't mean it's ever released publicly or commercially until he actually saw it by accident in Europe. Counsel, let me ask you something about the procedure here. It's different from what I'm familiar with, and I'm not sure I understand it. It looks as though an opposition has to be filed not later than 14 days before a hearing date, which is set evidently by the movement. So if the movement files his motion and sets a hearing date so that his motion is filed 21 days before the hearing date, you only get seven days minus weekends to reply. You might get four or five work days to do your reply. Is that right? If that, Your Honor, basically the whole sequence of events here were over 11 days. And under the local rules of the district court in a civil summary judgment motion, if it was filed on 21 days notice, the opposition would be due seven days thereafter. My unfamiliarity is that our dates always ran from when things were filed and served, in my experience, in state and federal court. I never saw it run backward from the date of a hearing. So you get four or five days. Now, as I understand it, a very large amount of discovery was produced for you at the same time as the motion to which you had to respond. Is that right? That's correct, Your Honor. How much was it? I can't tell you other than there was a number of depositions being taken during the one week. I just was asking for a number of pages. I believe there were two, maybe three, depositions that were being taken during the week  but also a sanctioned motion had to be filed. Now, the only time I can imagine a procedure like that in my own experience, and I don't know anything about central district and their practice there, is that if for some reason discovery got extended and the motion period got extended so it was all right on the eve of trial. Was that the circumstance here? No, Your Honor. However, the scheduling order of the judge of the district court did provide for the dates that we were operating under. And as the record shows, there was an earlier joint stipulation by all the parties in the case for not a continuous, necessarily the trial, but a continuation of the discovery cutoff and other dates due to certain individual defense being added late. And the court denied that without prejudice to reviewing that issue later. Maybe you could address the question on my mind. OK, I'm sorry. Was trial scheduled right after the hearing? No, Your Honor. Trial, I believe, and don't hold me to this without checking, I believe was scheduled for November is my recollection. So trial was months away? There was more than adequate time to continue. Hold on. I don't want a conclusion. I want to know how much time was there between this imbroglio about the motion for summary judgment and the scheduled date of trial. If my recollection is correct, Your Honor, the date line would have been 60 days approximately. And I can tell you specifically, it was not within a 30-day window. About two months away from trial when you had the battle about whether you could oppose the motion? I believe that's correct, Your Honor. I can give you exact dates. But we were not within anything close to even 30 days. Had you asked for other continuances or had any problems with the district judge before that? The interesting thing is not at all, Your Honor. In fact, there was only one actual appearance of the parties before this district judge, based on the district judge and doing things under submission as a practice. And that was the scheduling conference, which is just a scheduling conference. And so there was not a shred of any evidence in the record, because it never happened, of any issue of the appellant not complying with any rules or late filing. Sometimes people get on the judge's last nerve, and the record. I didn't see that here, but I was just curious. And I'm sure they'll tell me. One live appearance. It was a scheduling conference, which is a somewhat perfunctory type of hearing. So how big a firm are you? We are, at the time of this, we were six attorneys. OK. How big a firm is the other side? One is a very large firm. I'd let them speak as to the number of attorneys, but I believe more than 50. And the other firm is a small firm. There are two firms. Two different defendants. Two different sets of representation. But let me, just to make sure it's crystal clear, I think Is there some discussion of our Pincaid case? I can't remember, in the denial of your motion for relief. No. He cited only six circuit cases, and then one off-point answer. He did not cite the four-factor test that we applied for Rolls-Royce. There's not even a suggestion that it was ever considered. It's odd that he didn't cite the Ninth Circuit standard. How did he miss Pincaid? Did you not cite it, though? I was real excited about Pincaid. I'm not familiar with Pincaid, Your Honor, but let me just No, I am. The point is, when the judge That's our application of heritage and pioneer. And the stakes of counsel are excusable. We cite Pincaid in our appellant's brief. And did he cite it? Was it cited to the district court? We did not cite it to the district court. When this all happened in an 11-day period, just to go back to making sure there's an understanding of the practice of what happened in this court, the reality of the situation, the two motions, which were very voluminous with their exhibits, were both filed on August 25th. The last day. The last day. There was an application, first application for an extension in order to have a little more time in light of ongoing discovery, ongoing depositions that were taking place during the one week and the local rolls you get. Wasn't there a scheduled family trip or something like that? Well, actually, Your Honor Advanced purchase, non-refundable tickets or something? I can't remember. Not exactly. But what the evidence for the request for an extension showed was that I, as the responsible senior person in the case, was out of town on a schedule. Because I was an elected delegate to a political party's national convention, which was this week. And so I was not available. The associate wanted my input for during the one week to do all this. Plus, she was taking depositions that were scheduled and were taking place at the last moment. And in addition to that, the plaintiff, who would be required, of course, to file declarations, was out of town. I think that's what the Court's thinking of. He was on a family wedding. That's what I'm thinking of. So on August 29, ex parte application filed. These depositions, this was depositions scheduled by the defendants in this case? They were being taken by the plaintiff. And these were the dates of individual defendants in the case. They were party depositions. Important depositions. And due to the short period of time we're talking about, at the end of August, days literally, and as you can see from the papers, one of the parties claims that the opposition was due on four days versus getting over the Labor Day weekend. That's what we had. On the Labor Day weekend, the district court, and that's when I returned, by the way, Your Honor. And that's in the record also based on what was asked for in the first request for additional time of merely just a week to file these two oppositions. Exactly. You filed three days late, right? Well, we then got on September 2nd, so we're now talking about seven days from the filing on August 25. We got the Court's declination of the first request for a little extra time. And then, the strange thing here is, and this I can't address other than it is what it is. The act is the request, the first one, which had the wrong date by two days for when the oppositions were due. It shows September 4th. That's the Pinkei error that we've held can be under excusable neglect. And in a lesser way than Pinkei. Pinkei obviously dealing with a notice of appeal. Pinkei was a lot worse. A lot more significant issue, too. And the opinion that the en banc court reversed. So just to wrap up. Remember that. So to wrap up the point. So then, the next day is the opposition to the sanctions motion filed. So it's one day late technically. One day before when the attorney thought it was due. If the attorney realized that there was a mistake of two days. Then, it would have been filed on that Wednesday, which is two days late. The opposition to the summary judgment. And there was computer errors that were beyond control. And everything was filed three days, the summary judgment was filed three days late. With the application facing right up front to what was in the original papers, wrong date. And then saying, in addition, there was a one day delay due to computer problems beyond control. In the central district, if your 14th day is a Saturday or Sunday. Does that mean you have to file on Friday? It depends on the amount of time, because it's the 11 day rule of the Federal Civil Procedure. These papers, I believe, would have been due on September 2nd, the Tuesday following Labor Day. The appellees, interestingly enough, don't agree themselves on when they were due. They argue different dates. As just an aside on what may or may not be. Should be more straightforward, but a little confusing at times when you're a practitioner. So, here you have- We're over the time, so if my colleagues have no further questions, we'll wind up. Thank you, Your Honor. Thank you, counsel. May it please the court, I'm Terry Anastasiou, Ropers, Majeski, Cohn, and Bentley, appearing for the defendants, Seacrush, and the individual defendants, Sam Macaroni and Preston Lacey. Co-appellees' counsel, Mr. McInger, we have agreed that I will take ten minutes and he will take five. Would the clerk please run the clock that way? Thank you, Your Honor. That's helpful. I had planned to address myself primarily to the merits of the causes of action on which summary judgment was granted, but I gather that the court is troubled. I'm troubled. We don't confer before the cases. I'm real troubled because it looks like they didn't really have enough reasonable time to respond, and there was just no reason not to give them an extra few days, which is all they asked for. I'm also troubled. Me, too. We haven't conferred, but everyone's troubled. We got three troubles. Okay. Let me try and address the three troubles. Also, I have issues on your copyright claim, the copyright claims, too. Okay. Well, then I'll go fast on the troubles. The standing order, the scheduling order at issue here issued six months before the motion was filed. I don't know how a ---- Six months is totally meaningless because they didn't have six months to prepare in opposition to a motion that was filed 21 days before the cutoff. No, but they had noticed not to go out of town. They had noticed that a motion was probably going to be filed. Noticed not to go out of town? It's Labor Day weekend. How's a lawyer going to run his practice or his life if he doesn't go out of town? Your Honor, if I have a scheduling order in my hand that says that the deadline for summary judgment in a claim like this is September 15th. The way we always did it. And we know. Did you tell them you were going to file a summary judgment or did you just file it on the last day? I'm sorry. I know it was in the scheduling order, but did you tell them, did you give them advance notice, I'm going to file a summary judgment on August 25th? That's not in the record. I don't know the answer to that question. The way we always manage this in practice with nice people is if a lawyer called up and said, I've got a problem with my due date on this, the other lawyer would say, sure, send over a stipulation, I'll sign it. You don't do that with the short time, here's a thousand pages of discovery and you've got four days to write an opposition to my motion while you're out of town? Well, first of all, I'm not aware that there's anything in the record that we were asked for a continuance. Now, that may be my ignorance, but I'm not aware that we were asked for a continuance. I think they filed a motion for an extension of time. Did you oppose that? Did we oppose the motion? We certainly did. All right. It was filed after the papers were due. So you did not consent to a reasonable accommodation. We did not, Your Honor. That's right. That's right. So saying you weren't asked for a reasonable accommodation kind of lies. I take issue with the reasonable accommodation. What's unreasonable? You've got two months before trial. What's unreasonable about giving them an extra few days? The central district has a deadline for summary judgment motions that everybody knows about. This scheduling order had been in effect for six months. We were coming up on the deadline for motions. But you can't write an opposition to a motion until you read it. That's the problem. It's not that you have six months until your deadline. It's that you have four days after getting it. Because you have to read the thing. Well, Your Honor, our firm, the two attorneys working on this case, managed to write a reply to this in less time than the rules provide. Replies are easy because you don't have to get your ducks in a row, go through a thousand pages of discovery. This also shows why, had the district court applied the proper test, he would have had to allow the papers to be filed because you weren't prejudiced. And that's evidenced by the fact that you filed the reply. So our compliance with the court rules by Herculean effort to put in a reply that responded to some, I don't know how many dozens of additional material facts, that that works against us because that shows we weren't prejudiced? I'm sorry. I didn't make up the law. But that's what the law is in the Ninth Circuit. You consider the length of the delay, the prejudice, and there's two other factors I can't remember. Good faith? Well, anyway, he didn't apply any of them. And I don't like your tone, counsel. Listen, I've been there. Well, I apologize. I've been there. I've been a consulting partner at a really big law firm. I've also been a central district judge. And I've never seen something like this. You have the misfortune of addressing real lawyers who practice it. Well, I apologize, and I apologize for my tone. But there was no departure from any rules. There was no departure from a scheduling order. What we had was somebody coming back from time off and saying, I don't have the time to respond. The discovery, that's a deadline that was not unknown to the plaintiffs. The depositions about which the party was scheduled by the party. I don't care if everything is known. It is possible to load a party up with an amount of material, with a known deadline, as a strategy, so that they cannot possibly respond, and then to deny reasonable accommodations. I believe the ethical considerations in the Code of Professional Responsibility require lawyers to grant reasonable accommodations. But if you can deny them in combination with producing a vast amount of material and taking advantage of a short deadline, no matter how far in advance the deadlines were known, you can put opposing counsel in a position so that they cannot obtain a fair resolution on the merits of the claim. And that looks to me like the core of this case. Okay. Well, I will submit on the issue of appropriateness. No, why don't you respond to that? What am I missing? Why am I misunderstanding that? You must think I'm mistaken. So explain why. Educate me. I'm in a position where I don't know how to explain why compliance with a six-month-old scheduling order and the rules of court in which a case is docketed. Well, I think you're in a position where hardball benefited your client and you're continuing to represent your client. You got advantage by virtue of the court not applying the factors and not looking at it in a way that it appears that this court is troubled. We used to say with hardball guys, live by the sword, die by the sword. All right. I will submit on the issue of whether or not the court should have considered the opposition. The summary judgment still cannot be reversed unless, if the opposition had been considered a tribal issue regarding these causes of action. That's what I find really troubling, too. You won taking advantage of all the situation. You won summary judgment and then got this huge award of attorney's fees. And I've thought there were many issues of tribal fact on the joint authorship question. Okay. Well, permit me to address that very briefly in the time I have left. What is your other counsel going to address? Other counsel is going to talk to copyright issues and answer questions about attorney's fees as I understand it. Okay. Now, I think that our papers could have been of more guidance to the court if it had been, if they had been organized in the way I'm trying to understand this case in preparing for this argument. This is not really a copyright or Lanham Act case at all. It's a case about. I agree. It's an implied contract case that in the event was filed today. What did we have here? We had Mr. Henshaw. Are you familiar with the Richland decision? I'm sorry, ma'am. Are you familiar with the – it's Judge. But anyway, are you familiar with the Richland decision which discusses the copyright analysis for joint works? I still haven't heard the name of the case. Richland. Yes, ma'am. Yes, Your Honor, Judge. I'm familiar with it. But I'm also familiar with this Court's decision in Al-Muhammad. And that case talks about what is required to find that somebody's contribution, separate contribution to an artistic work is entitled to joint author status. And one of the things that is required is maintaining some sort of control over your work. And that goes to the heart of this here. Because what we had is we had Mr. Henshaw. He met somebody who took him to a meeting, introduced as a typist. He starts contributing some of his ideas. They like them. He's there for four meetings. He gives them these things. And he says, alleges, with the understanding I would be paid if they were used. He learns in April 2005 that they are not giving him credit. Before these meetings are over, he asks for producer's credit, and they say no way. He learns in April 2005 that they're not giving him credit. He demands payment. He never hears from him. He demands it again in August 2005. He doesn't hear from him. What this is is a case where, allegedly, my client failed to pay him for work that he voluntarily gave to him. Well, now, okay. So there's another case. I don't think anybody cited it. Sturt v. Agand. It involved the rear window and rights. The rear window was written as a short story, and it was put in a collective work. And published as a series of short stories. Later, it was made into the movie, the rear window. But the author of the rear window had copyrighted that section, that little work, which was part, then was developed into this rear window. And there was a fight over the heirs as to who had the rights to that. And ultimately, the heirs, the signing of the heirs, this is a Supreme Court case, was held to one, because each of the components of the collective work was separately copyrightable. Are you familiar with that case? Yes, I understand. This case, you know, the facts seem to be in dispute. And this case seems to fall into the situation where you have a collective work of a series of skits, some of which, and it's disputed, were original with the plaintiff. And he, in fact, got copyright registrations for them, which make it prima facie valid. And now the question is, was he really the sole author of that work? And I think, you know, that is the travel issue of material fact. I'm a minute 20 over. May I respond? Oh, yes, you may, of course. All right. In deposition, in the papers filed in summary judgment, Mr. Hanschen acknowledged the fact that this work was intended to be a work to which they were all contributing. Everybody was contributing not just big slabs of script, but they were contributing things large and small to the slabs of script as well. That's in his deposition. Now we come to the summary judgment motion, and that fact is used to argue that there is no joint authorship interest in the movie. And the opposition comes back and now. The movie. In the movie. Well, but that's. The skits are individually copyrightable works. But that was not the argument until the opposition to summary judgment came back. Before that, if you look at the complaint, it talks about the collaboration. It talks about the contribution. The only separate aspect of those, of the contributions, is the list of the copyrighted sketches. But that's not how they went in the movie, and that's not how, according to his deposition, that's not how they were intended to be in the movie. It was intended to be a big work. What did he ask for? He asked for a producer credit as to the work. What was he upset about? That he wasn't listed as a writer on the work. Then we come to opposition to summary judgment that I say the work, I meant my sketches. And unless the Court has any questions. Thank you, counsel. Hanschen versus. Oh, I'm sorry. I got confused. I am Leonard Mackinger, and I represent at Pelley Xenon Pictures. Xenon Pictures had nothing whatsoever to do with the production of the film. They became a distributor after. And we are relying on what we learned in this case in order to support the positions we've taken. We've joined. I'm curious. I would think that since if you publish a copyright, a work that violates somebody's copyright, like if you sell a pirated DVD, you're exposed to liability. I would just assume, I guess, not knowing anything of the industry, that distributors hold harmless agreements from the people that produce the movie. Is that the way the industry works? Generally, you get warranties, or you should get them. Whether that happened here, it's likely. But we are a separate entity, and we've been sued for something we had no involvement with. We distributed the picture, right? Yes. We distributed a picture. Isn't that like somebody distributes DVDs, and it turns out that they were pirated? Because the issue here is whether we knew about Mr. Hanschen and his involvement. Do you have to know? I think so. Otherwise, how can we be held liable? It's strict liability. I don't really know. I don't think it's strict liability. I think the issue here is whether or not we participated in the conduct Hanschen is complaining about, and that never happened. I think there might be statutory liability. But I think Judge Kleinfeld is probably right. In the business, you would necessarily have that arrangement with the people, the producers of the movie, that you would be held harmless. Well, you know, I'm not prepared to debate that issue because I wanted the Court to understand that we had no involvement with Mr. Hanschen until he showed up. And neither do I. You don't have to if you have strict liability for distributing work that violates copyright. Well, but we didn't. The point is we didn't know about his claims or about his participation. And that's the issue that I want to make. We are sort of on an island of our own. But the one of the questions that were raised here or was raised here by one of the panel was whether or not he had been given warning. That is, that Hanschen had been given warning of what we were up to. Well, you have been told about the scheduling order six months before. But we also had a conference call with the other side on the 6th of August telling them that we were going to file. Now, that would have caused someone who was planning to go away on a trip during this critical period not to do that. Did you say you were going to file how big on August 25th, the last day? They have to assume that it would be, you know, at 1159 p.m. on the last day or whatever. Well, they knew it was going to come on the last day because we told them that. So you have to tell your wife every time you plan a trip, sorry, I can't go. Opposing counsel told me they're going to file a motion, and I have no idea what's going to be entered or how much time it will take to respond. I didn't realize that I had to be married in order to appear for this argument. But the point is that ---- I'm thinking about how a lawyer lives his life and runs his practice. Well, if you ---- And I can't see how that could be accomplished in a reasonable way unless what you do is just staff everything out and ruin somebody else's life in your office instead of your own. Well, but they knew it was coming. I think that's what disturbed it. You always know something's coming. If you have a successful law practice, you have a lot of cases, and there's not a week when something's not coming. Well, but here he was told that it was a motion for summary judgment. Of course. It's not like a motion for fees, for example. The way normal lawyers in most towns do this is there's always something coming, and they just call each other and get reasonable accommodations and extensions of time so that they can deal with their caseload and their lives. That never came up. It never came up. Well, he moved for an extension, and it was vigorously opposed. No, but on August 6th when we had the telephone conference, that never came up. And then he leaves on the 25th. I think that's what annoyed the district court. He never gave a reason except here before your Honor. Here he announced that he was a delegate to a convention.  All he said was, I'm out of town. I think that's what disturbed the district court. The district court laid out a schedule long before the parties lived up to that schedule, at least on our side. And then we have one lawyer who has decided that he's going to leave town when this motion is coming on. He's not going to return early. He's not going to reset his trip. He's not going to have anybody to cover for him. I think that's what's disturbing about this, and that's why there hasn't been the necessary excusable negligence here. And in the Pioneer case, the four ‑‑ I won't go through all of them, but the two most important were the reason for the delay wasn't given. There wasn't any ‑‑ In Pioneer, it was, as Judge Wardlaw said, much worse. The lawyer just had the law wrong. I agree. But the standard that's set down there ‑‑ And that's that, under Ninth Circuit precedent. But the Supreme Court had said in Pioneer, excusable neglect means neglect, which is negligence. So we said, en banc, negligence is okay. You apply the four factors. Okay. But in applying the four factors, you have two that are not addressed by the plaintiff. His reason for delay didn't tell anybody until this moment in this court. Well, we knew something about a trip before, so it wasn't until this moment. No, it just said a trip. It didn't say why. No, if it was a trip. If somebody told you a trip out of town and you're saying that's not a reason for delay, you've got to say what you're doing out of town. You need to explain it. Well, I guess if the judge were a different party than the person's convention that they were going to, maybe they didn't want to tell. I don't know. That's not merely a joke. There are a lot of reasons why you wouldn't tell. Some illness that's not anybody's business, a political reason like that. But the illness one, the illness issue has come up in similar types of cases where the discretion of the court was affirmed saying that if somebody's ill, you've got a reason. We're over time. If there are any questions, obviously, I'm willing to answer. Thank you, counsel. So long morning. I'll really hold you to 30 seconds. Very short. If there's going to be a remand and a reversal, I would suggest this Court follow the one that was done in Couveau, which the Court found that it would be unfair to the litigants to have the Court revisit the summary judgment motion since it was self-apparent from the papers in support  I think that would be appropriate in this case to spare everybody. And recognizing my time is the 30 seconds. Zenon did not file a separate motion for summary judgment. Everything argued, I think, was based in on the record. And page 3 of the first ex parte application sets forth several paragraphs of specific cause that would be good cause for why a one-week request would be reasonable in the first case. Thank you, counsel.   The motion on page 3 of the first ex parte application now will be heard. A half-yen versus Zenon pictures is permitted. Do you want to recess? I apologize again. Don't worry about it. It's just the argument was getting a little heated. And I like it to be a conversation. It's okay. I'm fine either way, whichever you want. Do you want to recess or do you want to go forward? Okay, we'll go forward. We'll hear Rome versus Smith-Klein.
judges: Kleinfeld, Wardlaw, Callahan